[Crim. No. 1554.   Third Appellate District.—April 6. 1937.]

In the Matter of the Application of TED SERVAES for a
Writ of Habeas Corpus.

Ranse R. Sischo for Petitioner.

U. S. Webb, Attorney-General, Wilmer W. Morse, Deputy
Attorney-General, and F. A. Silveria, District Attorney, for
Respondent.

THOMPSON, J.—By means of a writ of *habeas corpus* the
petitioner seeks to obtain a discharge from custody on the
ground that the evidence which was adduced at the prelimi-
nary hearing fails to show there is a reasonable probability
that he is guilty of murder of the second degree, or of any
public offense whatever.

■ *Habeas corpus* is the proper remedy for the discharge of a prisoner who is illegally restrained of his liberty pursuant to a commitment by a magistrate when the preliminary examination fails to disclose "sufficient cause to believe the defendant guilty of a public offense". (Sec. 871, Pen. Code; 13 Cal. Jur. 230, sec. 12.)

The record of the proceedings upon the preliminary examination of the defendant discloses no sufficient cause to believe he is guilty of murder of the second degree, or of any public offense, and he should therefore be discharged from custody. It does not appear that an information has been filed in this case.

■ All that the evidence discloses is that the petitioner and his wife and children were living in the same cottage with Mr. and Mrs. Albert Galpin in a country district several miles from the scene where the body of the deceased was found. It appears that the petitioner owned a revolver and one or two other guns which were kept about the house and with which he sometimes hunted. It also appears that Albert Galpin owned a gun which he, too, kept in the cottage, and that he sometimes hunted with Servaes. The deceased was a boy by the name of Paul Fragulia. It appears that the petitioner and Galpin knew Fragulia slightly, but there is no evidence they ever associated with him, or that there was any enmity between them. It must be assumed their association was of a friendly nature. Absolutely no motive for the commission of the alleged homicide appears in the record.

The Gurr road is a country highway about five miles distant from Merced. This roadway crossed an arm of a swamp which was overgrown with bulrushes. This depression was spanned by a bridge. On the night of October 4, 1933, three years before the preliminary hearing was held, at about 7 o'clock in the evening, after dark, Mr. Miolano was driving in his automobile along that Gurr road. He saw the prostrate body of a boy lying face down on the bridge beside a bicycle. Supposing the boy had been struck and injured by a passing machine, he got out and examining the body he discovered that it was Paul Fragulia, whom he knew. The body was still lax and warm. Rolling the body over, Miolano found lacerations on his face, indicating that he had probably fallen on his face. Miolano had previously seen no machine or person in that vicinity, nor had he heard the firing of a gun. He

failed to discover the gunshot wound in the boy's forehead, which caused his death, and he looked for no weapon in the vicinity of his body, although there is no reason to believe it was a case of suicide. The body was placed in his automobile and taken to the hospital, where a surgeon found a ragged bullet wound penetrating the skull at a point about one inch above the left eye. The boy was dead when he reached the hospital. A post-mortem examination disclosed the fact that the bullet ranged downward and lodged at the base of the skull. The ragged nature of the wound and the fact that the bullet did not pass through the head of Fragulia indicate that it was either a ricocheted or a spent bullet fired from considerable distance.

There is evidence that as Miolano left the bridge after picking up the body of Fragulia he passed an old machine in which one unidentified individual was riding. Also a pig ran from the bulrushes by the roadside into the bumper of his machine and then rushed back into the swamp. Mrs. Rose Silva, the sister-in-law of the petitioner, who was living in the cottage where the petitioner and Galpin resided, testified that Servaes and Galpin "left the house after dark; . . . they said they were going hunting". The evidence fails to indicate whether one or both of them took guns with them. It does not appear where they were hunting, or whether they were in the vicinity of the place where the body of Fragulia was found on the bridge. Mrs. Silva testified that some time later they returned, and that the petitioner "had his pants rolled (up) and no shoes on", and that he said "they would have to go after those shoes". She also said "they claimed there was some shooting going on there also. . . . Both of them was thinking someone was firing toward them and *one of them fired in the air,* and then they came home. . . . One of them said it looked like there was something in the ditch, alongside the ditch. . . . I heard them say there was other people there, hunters out there." It appears that later Servaes and Galpin, accompanied by Mrs. Servaes, took a Chevrolet machine and went for the shoes. When they returned the witness had gone to bed.

Some time later an officer went to their home and was given a Colt revolver which belonged to the petitioner. It was a 32-20 caliber revolver. There is evidence that the bullet which was found in Fragulia's head "looked as though it might be

a 32–20 caliber bullet''. It contained marks of right-hand rifling. The evidence in the record is that the barrel of the revolver was grooved in the opposite direction.

It will be observed the evidence does not show where Servaes and Galpin went hunting. There is no evidence they were in the vicinity of the swamp or near the bridge where the body of Fragulia was found. The only evidence regarding that subject is that they said other hunters were near them, and were firing in their direction, and ''one of them fired in the air'' and they then came home. Mrs. Silva testified they did say ''it looked like there was something in the ditch''. It is apparent that if they were in the vicinity of the slough it was not the body of the boy which they saw ''in the ditch'', for his body was lying on the bridge.

There is absolutely no evidence that the boy was wilfully or unlawfully killed. Certainly there is no evidence which may reasonably be said to indicate that the petitioner fired the shot that killed him, either wilfully or accidentally. The two men were hunting together. The evidence does not indicate which one fired the shot ''up in the air''. It is just as probable that it was Galpin who did so as that the petitioner fired that shot. Or it might have been ''the other hunters'' who were shooting in the vicinity where Servaes and Galpin were hunting. Judging from the late hour at which they started hunting, it would seem impossible for them to have arrived at or near the bridge prior to 7 o'clock. Miolano who discovered the wounded boy at 7 o'clock heard no shot fired. The only machine which he saw contained but one individual and it was traveling toward the bridge after the body had been discovered. The petitioner and his family made no effort to leave that vicinity after the death of Fragulia. There was absolutely no motive shown for the shooting. The petitioner was not arrested until three years after the shooting occurred. The record discloses no evidence warranting a presumption that he fired the fatal shot. Nothing but sheer suspicion and vague speculation prompts the conclusion that he fired the shot. A reading of the entire record convinces one that Paul Fragulia was accidentally shot by a stray bullet just as he reached the bridge while he was riding on his bicycle along the highway. There is no evidence that either Galpin or Servaes fired the shot. But if either of them did so it must have been a spent bullet fired from a long distance which just

happened to hit the boy. At least there is no substantial evidence that the petitioner either deliberately or accidentally shot Fragulia.

The evidence falls far short of furnishing "sufficient cause" to believe the petitioner guilty of either a deliberate or an accidental homicide. Under such circumstances the magistrate had no jurisdiction to hold the petitioner for trial in the superior court on a charge of murder of the second degree, or for any other offense. No man should be forced to trial upon a serious charge of murder, or for any public offense, upon such flimsy and unsatisfactory proof.

The writ is granted and the prisoner is discharged.

Plummer, J., and Pullen, P. J., concurred.